H. J. SOLOMON v. A. L. CONGLETON

5-4668                                   432 S.W. 2d 865

Opinion Delivered October 28, 1968

*McKnight* & *Blackburn* for appellant.

*Tiner* & *Henry* for appellee.

JOHN A. FOGLEMAN, Justice.    This appeal is taken from a decree granting a mandatory injunction requiring appellant Solomon to remove that part of a levee which encroaches upon the south portion of appellee Congleton's land and another levee across Power Slough at the point it empties into L'Anguille River.

Congleton owns a forty-acre tract of land bounded on the south and east by Solomon's lands and on the north by the lands of one Crawford.    Power Slough runs in a southerly course across the lands of all three owners into L'Anguille River as it crosses appellant's lands.    The principal question involved is whether Solomon has obstructed a natural watercourse.    On disputed testimony, the chancellor found that Power Slough was a natural drain across the property of both appellant and appellee.

Ark. Stat. Ann. § 21-406 (Repl. 1956) makes it unlawful for anyone to cause any material to be thrown in any natural drain.    Section 21-407 authorizes anyone interested in the free flow of water through a drain to remove any material therein which tends to obstruct the flow.    The rights of the respective parties are determined under rules clearly set out in *Turner* v. *Smith*, 217 Ark. 441, 231 S.W. 2d 110.    Solomon has the right to fend off surface waters, so long as he does not unnecessarily damage his neighbor Congleton.    Congleton

has the right to have any natural stream or watercourse flowing from his land across Solomon's continue its southerly flow unimpeded. Otherwise, Solomon may use his land in any way he chooses, so long as he provides channels that will take care of the waters coming onto his land via any watercourse and so long as he leaves or provides channels that will take care of such waters in ordinary conditions and in times of any recurrent floods that may be reasonably expected.

The definition of a watercourse given in *Boone* v. *Wilson,* 125 Ark. 364, 188 S.W. 1160, and repeated in the *Turner* case, is:

> "* * * A 'watercourse' is defined to be 'a running stream of water; a natural stream, including rivers, creeks, runs and rivulets.' * * * there must be a stream, usually flowing in a particular direction, though it need not flow continually. It may sometimes be dry. It must flow in a definite channel, having a bed and banks, and usually discharges itself into some other stream or body of water. It must be something more than mere surface drainage over the entire face of the tract of land, occassioned by unusual freshets or other extraordinary causes."

The difficulty in this case is in determining where the preponderance of the sharply disputed evidence lies.

Funk & Wagnalls New Standard Dictionary of the English Language (1961) gives the following definitions of *slough.*

> "slough, 1. A place of deep mud or mire; bog; quagmire. * * * slough, [local, U.S.] 1. A depression in a prairie, often dry, forming part of the natural drainage- system; sometimes deeply miry. 2. A stagnant swamp or reedy inlet, small bayou, water-channel, or pound in which water backs up, or which is filled by freshets."

The chancellor found that Power Slough was a "natural drain." Since he granted a mandatory injunction requiring removal of the levee, which he found to have stopped the natural flow of water, we take this to be a finding that Power Slough was a watercourse. After weighing the evidence, we cannot say that his finding was against the preponderance thereof.

Congleton testified that Power Slough has a well-defined and visible marking that can be followed across his property at an angle and running down across the Solomon land to L'Anguille River. The Solomon levees, according to Congleton, were so built that he (Congleton) has no drainage. He admitted that the slough spreads out so that there is only a "dip" with a channel about two feet deep in places. He also admitted that he had cleared a substantial part of the slough bed for cultivation.

Orvil Thomas, a witness for Congleton, testified that Power Slough does not have any well-defined banks. He described the slough as an old river run, deep in places and shallow in places, but with no banks at all. According to him, there are places one would do well to wade in hip boots and others which are shallow. He stated that it was a sloping slough but that there was a run one could follow all the way through the area in question. He said it was a natural drain and the only drain through the area.

Jake Easter, another witness called by Congleton, cleared all of the Congleton land in the slough except for one-half acre. He said that the slough was about twenty feet wide.

Solomon testified that Power Slough is very wide and without definite banks. He added that there were several small sloughs coming south off Power Slough from the Crawford land and spreading out. According to him, the slough had no definite run at that point

but spread out into three runs, one of which ran across the corner of Congleton's property and two of which were on his own property. He said, however, that water did not run through a channel in Power Slough, but through three little "swags" and that the slough spread out over a distance of about 500 feet. This area, he added, was very low and swampy so that one could hardly walk through it because of the "elbow" brush. He admitted that, shortly after he first acquired his land about 1956, he dammed Power Slough where it was running through as a natural drainage area and used natural water for duck hunting on his premises.

Carl Brand, appellant's witness, stated that he thought the only drainage of the Congleton property was through Power Slough. Willie Stropes, another of appellant's witnesses, stated that the slough had no banks and was so flat that water six inches deep in it would cover an area 100 yards wide.

The fact that Power Slough may have intermittently flattened out and flowed without well-defined banks does not destroy its character as a watercourse or deprive an upland owner of his right to insist that the flow of water be unimpeded, if it has the essential attributes at other points. *Turner* v. *Smith*, 217 Ark. 441, 231 S.W. 2d 110.

When the testimony is so conflicting, we must accord some weight to the findings of the chancellor who saw and heard the witnesses and observed their actions and reactions throughout the trial. The most convincing evidence tipping the scale in favor of his finding is the admission of Solomon that he voluntarily paid Congleton in 1960 for damages to a bean crop resulting from his original dam across Power Slough after Congleton had him arrested for stopping up a natural drain.

We are not unmindful of the decision of this court in *Reddmann* v. *Reddmann*, 221 Ark. 727, 255 S.W. 2d 668. There are fundamental differences in the fact

situations in the case of *Turner* v. *Smith, supra,* and the *Reddmann* case. In the latter case we affirmed the finding of the chancery court and adopted the opinion of the chancellor. The facts, as found by the chancellor in this case, are closely parallel to those in the *Turner* case. In the *Reddmann* case, the chancellor specifically found that the lower owner had used the tract across which the alleged watercourse passed as a rice farm for 14 or 15 years. He said that this use of the very part of the land claimed to be a watercourse absolutely destroyed the contention that it was a watercourse. As another reason for denying the upland owner relief, the court specifically found that there were two obstructions across the so-called watercourse in the section of land downstream from the lower owner's property. These factors clearly indicated that the watercourse did not return to a well-defined channel after spreading out into "scatters."

Appellant also argues that the trial court erred in ordering removal of the dams or levees because its denial of damages to Congleton was based on a finding that the evidence in behalf of appellee was insufficient to show that the money damages sought by him resulted from the obstruction of the slough rather than backwater from L'Anguille River. It is sufficient on this point to state that Congleton and his witnesses testified that Congleton's land was damaged by the existence of the obstruction and Solomon and his witnesses testified that it was not. The finding that Congleton failed to meet his burden of proof on the recovery of damages prayed for is not necessarily inconsistent with the finding that he was entitled to injunctive relief.

The decree is affirmed.